IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

**CHRISTOPHER CARL ALBERTS**                                             **PLAINTIFF**

V.                         **CASE NO. 3:20-CV-3008**

**SERGEANT WADE WILLIS**                                                   **DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

This is a civil rights action filed by Plaintiff Christopher C. Alberts pursuant to 42 U.S.C. § 1983. Alberts proceeds *pro se* and *in forma pauperis*. He maintains that Defendant Sergeant Wade Willis used excessive force against him on December 2, 2019, while Alberts was incarcerated in the Boone County Detention Center ("BCDC"). Specifically, Alberts maintains that Sergeant Willis used excessive force by spraying him in the eyes with a chemical agent, Oleoresin Capsicum ("OC spray" or "pepper spray"), without any advance warning.

Pending before the Court is a Motion for Summary Judgment (Doc. 20) filed by Sergeant Willis. Alberts filed two Responses in Opposition (Docs. 26 & 34), and Sergeant Willis filed a Reply (Doc. 29). For the reasons explained below, the Motion is **GRANTED IN PART AND DENIED IN PART**.

**I.   BACKGROUND**

Alberts was booked into the BCDC on September 21, 2019, on pending criminal charges. He remained incarcerated there until he was transferred to the Washington County Detention Center ("WCDC") on December 4, 2019. During the late evening hours of December 2, 2019, the fire alarms at the BCDC went off, but there was no fire in

1

the facility. The parties' recounting of what took place on December 2nd differs in several important ways.

Alberts contends that the fire alarm went off not once, but twice in the late evening of December 2nd. He asserts that the first time the fire alarm went off, the inmates did not react by yelling or banging on the doors of their cells. *Id.* However, after about ten minutes, Steven Black, an inmate who had been assigned an upper-tier bunk, yelled that he could smell smoke. This is when the inmates started banging on the doors of their cells, apparently fearing that they would be left to succumb to smoke inhalation. According to Alberts, no guard came into the pod at that time. *Id.* The alarm stopped briefly and then began again. *Id.* Alberts states that he and the other inmates were afraid because they were locked down in their cells and had received no response from the guards.

According to Alberts, after the fire alarm went off for the second time, a trustee named Guy Conti entered the pod and yelled, "We're all gonna burn." (Doc. 26 at 2). Conti then left. Some time later, Sergeant Willis and Conti entered the pod. Sergeant Willis came up to Alberts's cell but did not speak to Alberts. Sergeant Willis then called out to Officer Jim Kelley, who was stationed at pod control, and asked for the door to Alberts's cell to be opened. Alberts claims that Sergeant Willis reached into his cell—and without issuing an order or a warning—released a short burst of pepper spray into Alberts's face. (Doc. 21-1 at 41). Alberts believes that Sergeant Willis was only about ten inches from his face at the time. He insists that no guard spoke over the intercom before this incident occurred and adds that the intercoms at the BCDC frequently

2

malfunctioned or simply did not work.  See Doc. 34 at 2.  Finally, Alberts claims that he has evidence of other unrecorded and unauthorized uses of pepper spray by Sergeant Willis.  (Doc. 26 at 8).

Officer Kelley provided the following report of the events on the night of December 2nd:

> [A]t approximately 2315 hrs. . . . while working Pod Control [I] observed Inmate Christopher Alberts kicking and beating his cell door because[] fire alarm system was sounding.  Alberts was yelling "they're going to let us all burn up and die" to the other inmates in C-Pod causing them to start yelling and beating their doors as well.  Alberts was also yelling to other inmates that they needed to rise up.  I called to Alberts on the cell speaker multiple times and told Alberts to stop kicking the cell door and to stop yelling to the other inmates but he would not.  Alberts continued beating the door and [i]nciting the other inmates in C-Pod escalating the situation.  At approximately 2325 hrs I contacted Sgt. Willis and advised him of the situation.  Sgt. Willis then came to C-Pod to deal with Alberts who was still yelling and beating the door.  I then opened Alberts['s] cell door where Sgt. Willis administered a short spray of O.C. pepper spray[]to Alberts['s] face to control the situation.  Sgt. Willis then escorted Albert[s] into booking for decontamination.

(Doc. 21-1 at 205).

In a separate affidavit, Officer Kelley explains that he told Alberts at least twice over the intercom that "there was no fire and ordered him to stop yelling and banging and kicking his cell door."  (Doc. 21-4 at 1).  When "[o]ther inmates began to yell and bang and kick on their doors," Officer Kelley believed "the situation escalated and grew increasingly dangerous."  Id.  At that point, he contacted Sergeant Willis for assistance. Id.  Officer Kelley maintains that he requested assistance because he "believed that Mr. Alberts' conduct was dangerous because it could incite a riot among inmates in the BCDC."  Id.  Because the disturbance had escalated to such a degree, Officer Kelley

3

agreed that "a short OC spray was necessary to control the situation and prevent a potential riot." *Id.* at 2.

Sergeant Willis's description of these events is as follows:

> At approx. 2325 Hrs I Sgt Willis got a call from pod control (Officer Kelly) that inmate Cristopher Alberts was beating on the door. I could hear the banging on the door and he was yelling that there was a fire (due to the fact the fire alarm sounded). At the same time there were also other inmates hitting their doors and it was my belief he was trying to in[c]ite a riot. Upon entering C-pod, inmate Alberts was still beating on the door. When I got to the door, Officer Kelly had it opened and I quickly administered a[n] 1-sec. jolt of O.C. pepper spray and cuffed Mr. Alberts. I then assisted him to booking where he was decontaminated and also his cell was cleaned. At approx. 2334 Hrs. Mr. Alberts was assisted back to C-3 cell.

(Doc. 21-1 at 204).

Sergeant Willis submitted a separate affidavit stating that Officer Kelley had repeatedly told Alberts that there was no fire and had warned him to stop yelling and banging and kicking on his cell door. (Doc. 21-5 at 1–2). Sergeant Willis maintains that after he was advised about the situation, he "went to Mr. Alberts' cell, Officer Kelley unlocked the door," and Sergeant Willis "opened the door and administered a short OC spray. Mr. Alberts quickly calmed and became compliant within about 30 seconds." *Id.* at 2. At the time, Sergeant Willis "believed that Mr. Alberts' conduct was dangerous because it could incite a riot among inmates in the BCDC." *Id.* He pointed out: "Because Officer Kelley's orders were disregarded by Mr. Alberts and the situation continued to escalate, I believed a short OC spray was necessary to control the situation and prevent a potential riot." *Id.*

When Alberts was asked during discovery to describe "any and all alleged injuries and/or illnesses" he suffered as a result of the pepper spray, he listed mental anguish,

4

pain and suffering, blurred vision, and an inability to focus his right eye. (Doc. 21-2 at 3). Alberts also confirmed that he had his eye examined by medical staff at the WCDC once he was transferred there. (Doc. 27 at 5). He claims that the WCDC's staff told him that since he was only "a courtesy hold," "there was nothing they could do." *Id.*

Defendants have submitted two video files documenting the incident. The first video is of C-Pod and covers the time frame from 23:33:00 to 23:36:00. The second video is of the booking room and covers 23:14:00 to 23:45:00.

The C-Pod video shows the following:

> 23:33:51   Sergeant Willis enters the pod and approaches Alberts's cell. Conti enters the pod behind Sergeant Willis.
> 23:33:55   Sergeant Willis steps to the left side of the cell door. Alberts can be seen standing at the cell door.
> 23:33:59   The cell door is opened, and Sergeant Willis immediately sprays Alberts.
> 23:34:03   Alberts's cell door is closed. Sergeant Willis walks to a cell located in the stairwell.
> 23:34:27   Sergeant Willis exits that area and returns to Alberts's cell door.
> 23:34:30   Sergeant Willis opens the cell door and Alberts steps out.
> 23:35:08   Sergeant Willis places Alberts in handcuffs.
> 23:35:19   Sergeant Willis escorts Alberts out of the pod.

The booking video shows the following:

> 23:26:50.[1]   Alberts is brought into the booking area and directed to a bench. At this point Alberts is still handcuffed. Sergeant Willis and Alberts talk for a time.
> 23:33:43   Alberts's handcuffs are removed. He wipes his hand down the right side of his face.
> 23:34:11   Alberts is taken to a sink and allowed to wash his eyes and face. He is given a towel. Alberts appears to cough a few times and seems slightly unsteady on his feet at one point.
> 23:36:10   Alberts is led back to the bench.

---

[1] Clearly, the timer on one of these cameras is off. According to the C-Pod video, Alberts does not leave the pod until 23:35:19, and yet, according to the booking video, he enters booking at 23:26:50.

The BCDC's use-of-force policy provides that "[d]etention officers may only use the minimum amount of force necessary to maintain order, restore discipline or obtain compliance with a lawful order." (Doc. 21-1 at 209). It further provides that "where immediate physical harm does not appear imminent," the following alternatives to the use of force will be used:

> (a) Verbally address the detainee and attempt to persuade him/her to stop the behavior;
> (b) Verbally advise the detainee as to the consequences that will occur if he/she does not stop the behavior; and
> (c) Request assistance from either detention officers, or the Detention Facility Administrator who, by virtue of their presence, may persuade the detainee to stop his/her behavior.

*Id.* at 209–210.

Pepper spray is considered a non-deadly use of force. *Id.* at 211. A certified officer may use pepper spray "to effect a lawful arrest, to prevent escape from lawful custody, to defend the officer or another from what the officer reasonably believes is the imminent use of physical force, or to restore institutional integrity in a detention facility." *Id.* Further, the policy states that "[w]hen all reasonable efforts have failed to calm a person who is acting violently and presenting a definite danger to himself or others, a minimum stream may be fired at the person." *Id.* Pepper spray "will be used only to terminate violent behavior, or the threat of violent behavior, which could result in injury to the officers, other persons, or the violent individual." *Id.* Normally the spray device will be "discharged from a distance of at least six (6) feet. The aiming point is the eyes." *Id.* Sergeant Willis was certified in the use of pepper spray in 2017 and 2019. *Id.* at 213–

6

214.

Jail Administrator Jason Day indicates that he reviewed the incident reports prepared by Officer Kelley and Sergeant Willis and spoke to both officers. *Id.* at 3. According to Administrator Day, "both confirmed their belief at the time that Mr. Alberts' conduct could incite a riot among inmates in the BCDC." *Id.* Further, both officers "confirmed that Mr. Alberts was told repeatedly that there was no fire and was ordered to stop yelling and banging and kicking on his door repeatedly but continued in defiance of the orders." *Id.* Based upon his review of the incident reports, his conversations with the officers, and his review of the video, Administrator Day "concluded Sgt. Willis did not violate BCDC policy on December 2, 2019." *Id.* Administrator Day does not indicate that he spoke to any other guards on duty, to Alberts, or to any other inmates who were in C-Pod at the time. *Id.*

During the two years leading up to the December 2nd incident with Alberts, Sergeant Willis was "investigated and disciplined twice for policy violations—once for improperly provoking an inmate, and once for improperly using OC spray against an inmate." *Id.* at 2. Specifically, Sergeant Willis was investigated by internal affairs for an incident involving the use of force in January of 2019. *Id.* It was determined that Sergeant Willis improperly provoked a disruptive inmate by saying, "quit being a cell warrior and do something." *Id.* The inmate then moved aggressively towards Sergeant Willis, and Sergeant Willis sprayed the inmate with pepper spray. *Id.* An internal investigation concluded that Sergeant Willis's use of the spray was in self-defense, but cautioned that he should "refrain from speaking to inmates in a provocative manner." *Id.*

7

at 2, 216–218.  Further, Sergeant Willis was instructed to "attempt to use minor physical force prior to using O.C. spray" and was ordered to receive training on department policies.  *Id.* at 218.  The next incident involving Sergeant Willis occurred in May of 2019 when an investigation determined he had improperly used pepper spray against an inmate following an exchange of words.  *Id.* at 2, 224–225.  Sergeant Willis was suspended without pay for three days.  *Id.* at 2, 224.

## II.    LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists."  *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor."  *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment."  *Id*. (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the

record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III. DISCUSSION

Sergeant Willis maintains that he is entitled to summary judgment because: (1) no excessive force was used; (2) there is no basis for any official-capacity claim; and (3) he is entitled to qualified immunity.

### A. Excessive Force

The objective reasonableness standard applies to excessive-force claims brought by pretrial detainees.[2] *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015). "[T]he defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.* at 394. A pretrial detainee "must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396.

The objective reasonableness of the use of force "turns on the 'facts and circumstances of each particular case.'" *Kingsley*, 576 U.S. at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). This determination must be made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* Additionally, "[a] court must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and

---

[2] Nothing in the summary judgment record indicates that Alberts had been convicted of a crime as of December 2, 2019.

9

practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'"  *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)).

"[O]bjective circumstances potentially relevant to a determination of excessive force" include:

> the reasonableness or unreasonableness of the force used; the relationship between the need for the use of force and the amount of force used; the extent of plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether plaintiff was actively resisting.

*Kingsley*, 576 U.S. at 397 (citing *Graham* 490 U.S. at 396).  An action is objectively unreasonable if it is not reasonably related to legitimate governmental interests, such as maintaining order and security, or is excessive in relation to that objective.  *Id.* at 398–99.

As discussed above, the parties present diametrically opposed versions of what led to Sergeant Willis's use of force on the date in question.  According to Sergeant Willis, he was summoned by Officer Kelley to quell a potential riot.  Sergeant Willis was told that Officer Kelley had already advised Alberts through the intercom that there was no fire and had ordered him to stop beating on the door, shouting, and attempting to get other inmates involved.  However, Alberts recounts that the fire alarms went off in the pod more than once; that one inmate said he smelled smoke; that Conti walked through the pod saying that they were all going to burn; that *all* of the inmates were banging on their doors and yelling; that no statements were made over the intercom or in person by any detention center employee to the effect that there was no fire; and that Sergeant Willis

10

purposely sprayed him in the eyes with pepper spray without any verbal warning.

The jail video confirms that Sergeant Willis entered the pod, walked directly to Alberts's cell, and sprayed Alberts as soon as his cell door opened. In addition, Alberts submitted witness statements from former inmates Jeff Long, Mike Hutton, Ron Craigen, and William D. Stanford, all of which support Alberts's version of the events. (Doc. 27 at 12–19). Unfortunately, however, the statements were neither sworn before a notary public nor qualify as unsworn declarations made "under penalty of perjury." *Elder-Keep v. Aksamit*, 460 F.3d 979, 984 (8th Cir. 2006) (finding that 28 U.S.C. § 1746 "mandates that the affiant declare, under penalty of perjury, that the facts contained in the affidavit are true"). Consequently, the Court cannot these witness statements on summary judgment. *Banks v. Deere*, 829 F.3d 661, 668 (8th Cir. 2016) (noting that statements that are neither sworn nor made under penalty of perjury may not be considered on summary judgment).[3]

If the Court were to assume that Sergeant Willis's and Deputy Kelley's version of events is true, a reasonable officer in that situation may well have believed that a short burst of pepper spray was a reasonable and justified response to Alberts's behavior. Indeed, the Eighth Circuit has recognized that "summary applications of force are constitutionally permissible when prison security and order, or the safety of other inmates

---

[3] In the Order (Doc. 23) directing Alberts to file a summary judgment response, he was specifically advised: "The affidavit must be based upon personal knowledge of the person executing the affidavit **and must be either**: (1) sworn and subscribed to by a notary public; or (2) executed under penalty of perjury, as provided for by 28 U.S.C. [§] 1746." In addition, the Court granted Alberts an extension of time to submit either affidavits or sworn statements from his witnesses, but he failed to do so. *See* Doc. 36.

or officers, has been placed in jeopardy." *Hickey v. Reeder*, 12 F.3d 754, 757 (8th Cir. 2000). Additionally, "[t]he infliction of pain in the course of a prison security measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

Failure to comply with orders may be one circumstance that justifies the use of force to gain compliance. *See, e.g., Hicks v. Norwood*, 640 F.3d 839, 842 (8th Cir. 2011). Whether non-compliance alone justifies the use of force depends on the surrounding circumstances, such as whether the inmate is confined to a cell or already restrained in some manner as opposed to being free to move about. It also may depend on the order given. Obviously, an order to cease fighting would be much more likely to justify the use of force than an order for an inmate to sweep his cell. In the first example, there is clearly a legitimate concern for maintaining order and discipline and for the safety and security of inmates and staff. In the second example, the order is made merely to enforce jail housekeeping rules. *See, e.g., Hickey*, 12 F.3d at 758 (finding it was not objectively reasonable for an officer to use his stun gun to gain an inmate's compliance with an order to sweep his cell).

In *Hickey*, the Eighth Circuit rejected the argument that "the Constitution permits the use of summary force to compel compliance with any direct order given in a jail setting, and that such authority is necessary to maintain control of the institution." *Id.* at 759. The Court stated that the defendants' argument "represents a fundamental

12

misunderstanding of the law concerning the use of summary force in prison settings. The law does not authorize the day-to-day policing by stun gun." *Id.* The Eighth Circuit concluded that "summary applications of force are constitutionally permissible when prison security and order, or the safety of other inmates or officers, has been placed in jeopardy." *Id.*; *see also Edwards v. Byrd*, 750 F.3d 728, 732 (8th Cir. 2014) (holding that it was clearly established that force used against inmates who were lying on the floor submissively, face-down, would violate the Eighth Amendment); *Thompson v. Zimmerman*, 350 F.3d 734, 735 (8th Cir. 2003) (finding that a reasonable officer would not believe force was needed to prevent injury or danger after an inmate had stopped yelling and kicking the doors); *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989) (holding that force may be justified to make an inmate comply with a lawful order, but only if the inmate's noncompliance posed a threat to other persons or to prison security).

With respect to the use of pepper spray, the Eighth Circuit in *Treats v. Morgan,* 308 F.3d 868, 872–73 (8th Cir. 2002), upheld an Eighth Amendment claim arising from a jail officer's use of pepper spray without warning on an inmate who may have questioned the officer's actions but posed no threat. Similarly, the Court of Appeals in *Walker v. Bowersox* reversed the district court's grant of summary judgment to a jail guard who used pepper spray on an inmate. 526 F.3d 1186, 1189 (8th Cir. 2017). The *Walker* Court found that there were genuine, material disputes of fact as to whether the jailer's use of pepper spray was "reasonable and in good faith" when the inmate was only accused of "disrupting the unit routine and distracting officers." *Id.* Finally, the law is

13

clear that "[p]rison regulations governing the conduct of correctional officers are also relevant in determining whether an inmate's right was clearly established."  *Treats*, 308 F.3d at 875.  The BCDC's own policies limit a jail officer to using only "the minimum amount of force necessary to maintain order, restore discipline or obtain compliance with a lawful order."  (Doc. 21-1 at 209).  Moreover, a certified BCDC officer may only use pepper spray "to effect a lawful arrest, to prevent escape from lawful custody, to defend the officer or another from what the officer reasonably believes is the imminent use of physical force, or to restore institutional integrity in a detention facility" after "all reasonable efforts have failed to calm a person who is acting violently and presenting a definite danger to himself or others . . . ."  *Id.* at 211.

If Alberts's version of the events is true, then Sergeant Willis sprayed him in the face without provocation or justification, at a time when Alberts and his fellow inmates genuinely believed there was a fire in the facility and that their jailers were doing nothing to help them.  Further, if Alberts is right, the intercom system was not working at the time, and he did not hear any announcement that there was no fire, nor did he hear any order to stand down and stop yelling for help.  Under those facts, the use of pepper spray could be construed by a reasonable officer as an arbitrary, excessive, and unwarranted use of force.  Since the jail videos lack audio, it is impossible for the Court to determine whether Alberts's version of events is true, or whether Sergeant Willis's version is true.  The Court must resolve all disputed, material questions of fact in the light most favorable to the non-movant at summary judgment.  Here, the non-movant is Alberts, and the Court must therefore deny Sergeant Willis's motion as to the excessive-force claim.

### B. Official-Capacity Claim

An official-capacity claim is considered a claim against the employing governmental entity, here, Boone County. *Crawford v. Van Buren Cnty.*, 678 F.3d 666, 669 (8th Cir. 2012). "Section 1983 liability for a constitutional violation may attach to a [County] if the violation resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom,' or (3) a deliberately indifferent failure to train or supervise." *Corwin v. City of Independence, Mo.*, 829 F.3d 695, 699 (8th Cir. 2016) (citations omitted).

Alberts does not contend that any of the BCDC's policies were unconstitutional. Instead, Alberts contends that Sergeant Willis violated the policy of the BCDC regarding the use of force and the use of pepper spray. However, municipal liability may also be established through proof of an unofficial custom:

> [A] plaintiff may establish municipal liability through an unofficial custom of the municipality by demonstrating (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Corwin*, 829 F.3d at 700 (citation and internal quotation marks omitted).

While Alberts makes the point in his briefing that Sergeant Willis had, on multiple occasions, used excessive force against inmates, Alberts does not claim that other employees of the BCDC also used excessive force. Without evidence of more incidents, the use of excessive force can hardly be said to constitute a continuing, widespread, persistent pattern of unconstitutional conduct.

If, on the other hand, the nature of Alberts's official-capacity claim arises from an alleged failure to train or supervise, this claim also fails. *See Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010) (outlining the elements of a valid failure-to-train claim). Alberts has presented no evidence as to the inadequacy of the BCDC's use-of-force training or pepper-spray training. Similarly, Alberts has advanced no proof regarding a failure to supervise. For these reasons, Sergeant Willis is entitled to summary judgment on the official-capacity claim.

### C. Qualified Immunity

"Government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341-43 (1986)).

Determining whether a defendant is entitled to qualified immunity requires a two-step inquiry. *Jones v. McNeese*, 675 F.3d 1158, 1161 (8th Cir. 2012). First, the court must determine whether the facts demonstrate a deprivation of a constitutional right. *Id.* (citing *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010)). If so, the court must decide whether the implicated right was clearly established at the time of the deprivation. *Id.*; *see also Krout v. Goemmer,* 583 F.3d 557, 564 (8th Cir. 2009) ("Unless the answer to both these questions is yes, the defendants are entitled to qualified immunity.").

As discussed above, the Court believes there is a genuine issue of material fact as to whether Sergeant Willis used excessive force under the facts and circumstances of this case. In *Tolan v. Cotton,* 572 U.S. 650, 657 (2014), the Supreme Court held that where material facts are disputed—for instance, when there are contradictory statements concerning a fact—the court must resolve that dispute in favor of the non-moving party at the summary judgment stage. In this case, as discussed above, there are material facts in dispute concerning whether Alberts's constitutional rights were violated. If the Court assumes that the facts recited by Alberts are true, then it would have been clearly established at the time that spraying him with pepper spray—without advance warning or legitimate penological justification—was an excessive use of force that violated Alberts's Eighth Amendment rights. *See Hickey*, 12 F.3d at 75–59 (finding that use of force by jailer was exaggerated response to misconduct); *Treats*, 308 F.3d at 874 (holding that inmate asserted valid Eighth Amendment claim when jail officer pepper-sprayed him maliciously, without warning, and without evidence that inmate was "perceived to be a threat to [the officers] or institutional security at the time"). For these reasons, qualified immunity is denied on this claim.

## IV.    CONCLUSION

For the reasons stated, the Defendant's Motion for Summary Judgment (Doc. 20) is **GRANTED IN PART AND DENIED IN PART.** The Motion is **GRANTED** with respect to the official-capacity claim and **DENIED** as to the individual-capacity excessive-force claim.

**IT IS SO ORDERED** on this 18th day of December, 2020.

                                                                       _____
                                                                       TIMOTHY L. BROOKS
                                                                       UNITED STATES DISTRICT JUDGE